<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

OM SRIVASTAVA, TUSHAR PARIKH and
THOMAS MICHALSKI,

                Plaintiffs,

      v.

DANAHER CONTROLS and GID ACQUISITION
COMPANY d/b/a GULTON GRAPHIC
INSTRUMENTS DIVISION,

              Defendants.

CIVIL ACTION NO. 02-4932
(DRD)

**<u>OPINION</u>**

<u>Appearances</u>

Ronald J. Gregorio, Esq.
Richard A. West, Esq.
Paul J. McAdam, Esq.
LUM, DANZIS, DRASCO & POSITAN, LLC
103 Eisenhower Parkway
Roseland, NJ 07068

*Attorneys for Plaintiffs*

Stephen H. Jett, Esq.
Robert H. Fischer, Esq.
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114

1

Cheryl M. Stanton, Esq.
Patrick M. Stanton, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10 Madison Avenue, Suite 402
Morristown, NJ 07960

*Attorneys for Defendants*

## OPINION

### DEBEVOISE, Senior District Judge

Presently before the court are cross-motions for summary judgment. For the reasons discussed herein, Plaintiffs' motion will be denied with respect to their claims and will be granted with respect to Defendants' fraud counterclaim, and Defendants' motion correspondingly will be granted with respect to Plaintiffs' claims and will be denied with respect to Defendants' fraud counterclaim.

## FACTS

Plaintiffs Om Srivastava, Tushar Parikh, and Thomas Michalski (collectively, "Plaintiffs") were employees of Defendants Danaher Controls and GID Acquisition Company (collectively, "Defendants") and worked in Defendants' facility in Metuchen, New Jersey, which manufactured thermal printheads. Srivastava was vice president and general manager, Parikh was sales and marketing manager, and Michalski was production manager. In December 2001, Defendants decided to close the Metuchen facility and to pay severance and "stay bonuses"[1] to employees. On or about December 1, 2001, Srivastava was notified of the decision to shut down the Metuchen facility and was instructed to communicate the severance and stay bonus payments

_____

[1]"Stay bonuses" were paid as incentives for employees to work at the Metuchen facility until the actual closing date of April 26, 2002

to the employees.  Accordingly, on or about December 13, 2001, Srivastava verbally informed Defendants' employees of the severance package and stay bonus.  Defendants also made a list, dated 12/11/01 and titled "Gulton Graphics Metuchen Facility Severance Analysis" (the "Severance Analysis"), of employees along with the amounts of severance and stay bonus due to each employee.  According to the Severance Analysis, the following payments were to be made to Plaintiffs:

| Plaintiff | Severance | Stay bonus |
|-----------|-----------|------------|
| Parikh | $4,514.42 | $5,000.00 |
| Michalski | $15,989.62 | $20,000.00 |
| Srivastava | $52,457.50 | --- |

Employees were given the choice of either taking their severance payments in one lump sum payment or according to the ordinary pay periods.  In addition to the Severance Analysis, Defendants provided a document titled "Benefits: General" (together with the Severance Analysis, the "Benefits Materials").  The "Benefits: General" document included provisions concerning severance payments, vacation, health care benefits, retirement and savings plan, unemployment benefits, and outplacement.

In addition to the severance package and stay bonus, Srivastava and Michalski were entitled to receive performance bonuses in accordance with a company-wide plan based on certain criteria to which Srivastava and Michalski signed off on at the beginning of each year. The amount of performance bonuses was determined based on certain objective criteria specified in the plan.  Defendants contend that Plaintiffs were paid in full for all the criteria which they achieved but were not paid for ending inventory balance because they did not achieve that

3

criterion.  Srivastava and Michalski argue that the performance criterion set for ending inventory balance was unrealistic and could not have been met totally; therefore, they argue, they are entitled to receive the maximum amount of performance bonus.

During the plant closing process, Defendants sought to sell the assets of the Metuchen facility.  They received two bids for equipment, one in the amount of $50,800 and another for a lesser amount.  Defendants also received bids for inventory of approximately $10,000 for usable components and approximately $30,000 for scrap.  In January 2002, Plaintiffs approached Defendants for the purpose of purchasing the assets of the Metuchen facility, and on February 1, 2002 presented a formal letter of intent to Defendants.

On or about February 26, 2002, after Bob Joyce, the vice president and business unit manager of Danaher Controls, informed Plaintiffs that their offer would be accepted, Joyce copied Srivastava on an e-mail stating that some of the Metuchen employees would receive severance pay and stay bonuses.  Srivastava called Joyce to clarify this e-mail message because Srivastava believed that all, not some, employees were to receive severance and stay bonuses. Joyce informed Srivastava that if Plaintiffs wanted to purchase Defendants' assets, they would not receive severance and stay bonus payments.  When Srivastava objected, Joyce said that Defendants would not go forward with the proposed asset purchase unless Plaintiffs took the severance and stay bonus issues "off the table."  Srivastava agreed to take these issues "off the table."

In March 2002, Defendants asked each Plaintiff to sign a release.  Plaintiffs refused to sign their respective releases.

The parties, through their counsel, negotiated an asset purchase agreement (the "APA").

4

Several drafts were exchanged between counsel, with counsel amending and revising the terms and conditions of the APA.  The parties executed a final version of the APA on or about March 28, 2002.  The assets were sold to Gulton Incorporated ("Gulton"), a company Plaintiffs formed specifically for the purchase.  The executed APA states that "this Agreement constitutes the entire Agreement between the parties and supersedes any prior understanding, agreements, negotiations, or discussions, whether written or oral, concerning the subject matter hereof."  The purchase price was $130,000.00 and the assumption of lease and warranty obligations was worth $203,000 and $100,000 respectively.

Upon completion of the asset purchase transaction, Defendants paid severance and stay bonuses to all employees except Plaintiffs.  Plaintiffs pursued the severance and bonus issues with Defendants but were unable to come to a resolution.  Plaintiffs filed this action, alleging ERISA violations and breach of contract and seeking attorneys fees and damages in the following amounts:

> Srivastava:  $55,685.50
> Parikh: $9,514.42
> Michalski: $32,789.80

Defendants counterclaimed against Srivastava, alleging that Srivastava fraudulently induced Defendants to enter into the APA by promising to waive the severance and bonus payments while intending to revisit their claims to severance and bonus payments after the APA was finalized.

### *STANDARD OF REVIEW*

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED. R. CIV. P. 56(c).  Rule 56(c) imposes a burden on the moving party simply to point

out to the district court that there is an absence of evidence to support the non-moving party's

case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met this burden, the burden then shifts to the non-moving

party.  The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts."  Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).  Moreover, she may not simply "replace conclusory allegations of the complaint or

answer with conclusory allegations of an affidavit."  Lujan v. National Wildlife Federation, 497

U.S. 871, 888 (1990) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Rather,

she must "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P.

56(e).

At the summary judgment stage, the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial.  Anderson, 477 U.S. at 249.  The mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment.  Id. at

247.  In determining whether there exists a material issue of disputed fact, however, the facts and

the inferences to be drawn from the facts are to be viewed in the light most favorable to the non-

moving party.  Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

## *DISCUSSION*

## I.  ERISA

Plaintiffs characterize Defendants' severance payments as an ERISA plan evidenced by a

writing which cannot be modified orally.  Defendants, on the other hand, argue that Plaintiffs'

claims for severance are not governed by ERISA because severance payments to some of Defendants' employees did not require the establishment of an administrative scheme and therefore did not constitute an ERISA plan. The critical issue is therefore whether the Benefits Materials constitutes an ERISA plan.

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., gives federal district courts subject matter jurisdiction over claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B), which authorizes a cause of action for benefits due under an employee benefit plan. See 29 U.S.C. § 1132(e). Whether an ERISA employee benefit plan exists is an integral issue. Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees, 974 F.2d 391, 397-398 (3d Cir. 1992). In determining whether an ERISA employee benefit plan exists, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." Henglein, 974 F.2d at 399 (quoting Donovan v. Dillingham, 688 F.2d 1367 (11th Cir. 1982)). An informal severance arrangement may constitute an employee benefit plan subject to ERISA. Id. at 400. Severance benefits, however, do not implicate ERISA "unless they require the establishment and maintenance of a separate and ongoing administrative scheme." Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538 (3d Cir. 1992). When determining whether payments require an ongoing administrative scheme, factors to consider include: (1) whether payments are one-time lump sum payments, (2) whether the employer undertook any long-term obligation with respect to the payments, (3) whether the severance payments become due upon the occurrence of a single, unique event or any time that the employer terminates employees, and (4) whether the severance arrangement requires the employer to engage in a case-by-case review of employees.

Crews v. Gen. Am. Life Ins. Co., 274 F.3d 502, 506 (8th Cir. 2001); see also Taverna v. Credit

Suisse First Boston (USA), Inc., 02 Civ. 5240 (DC), 2003 U.S. Dist. LEXIS 1607, 7-8 (S.D.N.Y.

2003) (noting that no ERISA plan exists where manager did not have discretion in administering

payments).  In Angst, the Court of Appeals found that "neither the one-time payment, nor the

continuation of existing benefits, nor a combination of both, invoked the application of ERISA."

969 F.2d at 1539.  A one-time, lump-sum payment triggered by a single event requires no

administrative scheme and therefore would not constitute an ERISA plan.  Fort Halifax Packing

Co. v. Coyne, 482 U.S. 1, 12 (1987).

        In this case, the Benefits Materials provided for either a lump-sum payment or payments

according to the ordinary pay periods; in either case, the amount would be equivalent to one

week's pay for each year of service, up to a maximum of 26 weeks.  First, clearly the lump sum

payment would not constitute an ERISA plan.  Second, even if an employee chose to receive

payments according to the ordinary pay periods rather than a lump sum, such a payment schedule

would not have required Defendants to undertake a long-term obligation.  If the maximum

severance payment was equivalent to 26 weeks, payments according to ordinary pay periods

would at most last 26 weeks, or half a year.  This maximum length of 26 weeks does not

constitute a long-term obligation, especially in light of several cases which have found no ERISA

plan where the payments extended over a period of time lengthier than 26 weeks.  See, e.g.,

Angst, 969 F.2d at 1538-39 (finding no ERISA plan even where benefits included one year of

payments).  Furthermore and importantly, there is no evidence that payments in this case required

the creation of a separate and ongoing administrative scheme.  In fact, Srivastava testified that

"when somebody was given severance they were given the option of either taking the whole

amount in a lump sum or take it as per the pay period policy." (7/17/03 Srivastava Dep. at 26:19-22.) This statement indicates that recipients of severance pay would receive payments according to the preexisting pay period schedule. <u>Angst</u>, 969 F.2d at 1539. Third, the payments became due upon the occurrence of a single, unique event – *i.e.*, the closing of the Metuchen facility by Defendants – rather than at any time that Defendants terminated an employee. [T]his was a single-circumstance plan addressing a single event, and . . . no discretionary analysis was required with the plan at issue and the simple disbursement of a set amount of money to each employee applicant would require no ongoing administrative scheme." <u>Way v. Ohio Cas. Ins. Co.</u>, 346 F. Supp. 2d 711, 715 (D.N.J. 2004) (discussing <u>Angst</u>, 969 F.2d at 1538). Fourth, administration of the severance payments was clearly set forth in the Benefits Materials: "One week's pay for each year of service up to a maximum of 26 weeks." As such, administration of these payments did not require any managerial discretion of the type regulated by ERISA but only required simple calculation of length of employment by Defendants multiplied by salary.

Plaintiffs argue in their reply brief that "[b]ecause Defendants' plan [*i.e.*, the Benefits Materials] included provisions for health insurance, vacation, unemployment, and outplacement benefits, it is an ERISA plan as defined by 29 U.S.C. § 1002(1)."[2] (Pls.' Reply Br. at 2.)

---

[2]Plaintiffs quote the following portion of 29 U.S.C. § 1002(1):

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs . . . .

Fundamentally, however, the Benefits Materials provides a summary of benefits to employees upon their severance from employment by Defendants.  The fact that the Benefits Materials might also cover health insurance, vacation, unemployment and outplacement benefits in addition to severance payments does not convert the Benefits Materials into an ERISA plan. None of the listed benefits requires "the establishment and maintenance of a separate and ongoing administrative scheme," which is a prerequisite to finding that severance benefits constitute an ERISA plan.  Angst, 969 F.2d at 1538.

Plaintiffs also argue that Defendants' plan is identical to the ERISA plan in Alston v. Atl. Elec. Co., 962 F. Supp. 616 (D.N.J. 1997).  In Alston, the court found that one of the severance plans was an ERISA plan because it required an "ongoing" "administrative scheme for its implementation."  Id. at 623.  It is true, as Plaintiffs note, that the ERISA plan in Alston provided, *inter alia*, severance pay in either a lump sum or over time, extended health care benefits, and outplacement training – severance benefits which appear similar to the benefits offered in this case.  The distinguishing factor between Alston and this case, however, is that the defendant company in Alston announced an early retirement program but continued to run its business and was not shutting down or selling its assets.  The fact that the defendant company in Alston continued its business operations meant that it also had to establish and continue an ongoing management scheme for administering the early retirement program as its employees became eligible.  In contrast, Defendants' closure of the Metuchen facility, upon which severance benefits became due, was a single, unique event that would not recur.  The severance benefits offered by Defendants did not require the establishment of an ongoing administrative scheme because all eligible employees would receive severance benefits upon Defendants' closure of the

10

Metuchen facility.  There would be no future eligible employees that would require establishing an ongoing administrative scheme, and therefore Defendants' severance plan is not an ERISA plan.

In summary, the severance benefits provided by Defendants and outlined in the Benefits Materials did not constitute an ERISA plan.  Accordingly, Defendants did not violate ERISA by failing to pay severance benefits to Plaintiffs.

## II.  Breach of contract

Plaintiffs allege that Defendants breached an oral contract and violated quasi-contract principles because Defendants failed to pay severance and stay bonuses to all three Plaintiffs and performance bonuses to Michalski and Srivastava.  Defendants do not dispute that an oral contract was formed which required Defendants to pay severance and stay bonuses, but they argue that they do not owe any payments to Plaintiffs because Plaintiffs rescinded, abandoned, or waived the oral contract during negotiations over the APA.  With respect to stay bonuses, Defendants also contend that Srivastava was never offered a stay bonus, and Michalski and Parikh did not sign their releases, which were conditions precedent to receiving their stay bonuses.  With respect to performance bonuses, Defendants argue that Srivastava and Michalski received the full amount they were entitled to receive pursuant to an agreed formula.  Srivastava and Michalski do not dispute Defendants' contention that they were paid performance bonuses calculated pursuant to the formula, but they contend that they should have received the maximum performance bonuses because the performance goals set by Defendants were unattainable. Srivastava and Michalski also argue that their performance bonus claims are not ripe for summary judgment due to the existence of factual issues.

11

Before reaching the merits of Plaintiffs' breach of contract claims, the issue of whether the parol evidence rule bars the introduction of evidence of Plaintiffs' oral waiver of severance and stay bonus payments (collectively, the "severance benefits") will be addressed.  If the parol evidence rule bars such evidence, then Plaintiffs would prevail because it is undisputed that an oral contract to pay severance and stay bonuses was formed.

The parol evidence rule operates to prohibit the introduction of extrinsic evidence to alter or vary an integrated written instrument.  Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J. Super. 570, 573 (N.J. Super. Ct. App. Div. 1991).  Plaintiffs contend that Defendants should be prohibited from introducing evidence of Plaintiffs' oral waiver of their severance benefits because the APA is a fully integrated contract that cannot be altered by extrinsic evidence.  Defendants respond to this argument by pointing out that the APA creates no obligation to pay severance or stay bonuses.  Defendants have the better argument.

The APA contains an integration clause which states: "[t]his Agreement constitutes the entire Agreement between the parties and supersedes any prior understanding, agreements, negotiations, or discussions, whether written or oral, concerning the subject matter hereof."  The parol evidence rule is applicable only if the integration clause of the APA clearly covers severance and stay bonus payments.  See Raiczyk v. Ocean County Veterinary Hosp., 377 F.3d 266, 271 (3d Cir. 2004).  In Raiczyk, the Court of Appeals rejected application of the parol evidence rule because the integration clause did not clearly cover the loans at issue, which were not mentioned in the sales agreement.  Id.  In this case, Plaintiffs contend that evidence of their purported waiver of severance and stay bonus payments should be barred because the extrinsic evidence directly contradicts paragraph 2.3 of the APA, which states in pertinent part:

> Seller shall also be solely responsible for and shall pay all obligations and
> liabilities of Seller for compensation and benefits with respect to the Employees
> which accrue or are payable on or prior to the Closing Date . . . including, without
> limitation, all obligations of Seller whenever payable or accrued for . . . severance
> payments, other forms of compensation, benefits . . .

The problem with Plaintiffs' argument is that the APA does not create and is not the source of any alleged obligation of Defendants to pay Plaintiffs severance or stay bonuses. With respect to the payment of severance benefits, the APA is silent as to the identity of employees that might be eligible to receive such payment, the amount of severance, the procedure for receiving severance, and other material terms pertaining to an obligation to pay severance benefits to Plaintiffs. Paragraph 2.3 merely states that Defendants will be responsible for any obligations it might have to pay, *inter alia*, severance to employees; it does not create any rights for employees to receive severance or any new liabilities for Defendants to pay severance. With respect to stay bonuses, they are not mentioned in the APA. The APA is a separate contract from the oral contract regarding severance and stay bonuses. The integration clause of the APA does not clearly cover severance or stay bonus payments, and the parol evidence rule does not bar the introduction of evidence of Plaintiffs' waiver of these payments.

To the extent that Plaintiffs contend that the parol evidence rule applies to the Benefits Materials to bar introduction of extrinsic evidence, such an argument cannot be sustained because the Benefits Materials are not integrated writings.

Accordingly, the parol evidence rule does not bar the introduction of evidence pertaining to Plaintiffs' purported waiver of severance and stay bonus payments.

_(A)  Severance payments & stay bonuses (collectively, "severance benefits")_[3]

It is undisputed that an oral contract was formed for Defendants to pay severance to Plaintiffs and stay bonuses to Michalski and Parikh.  Defendants, however, argue that during the asset purchase negotiations, the parties mutually agreed to rescind, abandon, or waive these obligations in exchange for Defendants' agreement to proceed with the asset purchase transaction.  Plaintiffs apparently do not dispute that Srivastava, on behalf of all Plaintiffs, orally waived severance and stay bonus payments by agreeing to take these issues "off the table," but they insist that such a waiver (1) was invalid because Defendants offered no consideration for such waiver, or (2) applied only to discussions concerning the asset purchase transaction and did not prevent revisitation of these claims after the APA was finalized.  Thus, the issue is whether Plaintiffs waived their claims to severance and stay bonus payments.  As previously noted, evidence of Plaintiffs' waiver of severance and bonus payments is not prohibited by the parol evidence rule and may be considered.

The undisputed evidence shows that Plaintiffs agreed to relinquish their claims for severance and stay bonus payments in exchange for Defendants' agreement to proceed with selling their assets to Plaintiffs.  Plaintiffs admit that Joyce informed Srivastava that unless Plaintiffs took their claims to severance benefits "off the table," Defendants would not proceed with the asset sale.  (Pls.' Br. at 19: "On or about February 26, . . . Defendants unilaterally decided not to pay Plaintiffs severance and stay benefits and communicated to Plaintiffs that the asset purchase would be conditional upon a waiver of severance and stay benefits.")  Plaintiffs

---

[3]Because Plaintiffs' claims to health benefits are premised upon their rights to receive severance, claims to health benefits need not be addressed because Defendants were not contractually obligated to pay severance to Plaintiffs, as more fully explained in this section.

14

also admit that Srivastava agreed to take their claims "off the table" in order to proceed with the asset purchase transaction.  In this case, Defendants' proposal to terminate the oral contract was accepted by Srivastava on behalf of Plaintiffs.  During a telephone conversation on February 26, 2002, Joyce informed Srivastava that the asset purchase transaction would not proceed unless Plaintiffs took the severance issues "off the table." Srivastava testified that on February 27, 2002, he telephoned Joyce and said, "OK.  The subject is off the table."  (Srivastava Dep. at 59:4-5.)  Therefore, Srivastava's agreement to take the severance and stay bonus issues "off the table" constituted abandonment of Plaintiffs' contractual rights to receive severance and stay bonus payments.  Abandonment of a contract can only take place by the mutual assent of both parties.  County of Morris v. Fauver, 153 N.J. 80, 96 (N.J. 1998).  In this case, the parties mutually agreed to take the severance benefits issue "off the table."  The consideration received by Plaintiffs was Defendants' agreement to proceed with the asset purchase transaction.

Plaintiffs also argue that any waiver of their claims was invalid because it was not included in the APA, which contains an integration clause.  This argument fails, however, largely for the same reasons that evidence of their waiver is not barred by the parol evidence rule, *i.e.*, the integration clause of the APA does not clearly cover severance or stay bonus payments.  The "off the table" conversations, which occurred before the execution of the APA, are not barred by the terms of the APA or the parol evidence rule because the APA does not cover severance and stay bonus payments.

With respect to Plaintiffs' argument that "Srivastava understood [his waiver] to mean that he would not discuss the severance, stay bonus, and performance bonus issues until after the asset purchase was finalized, and agreed to take these issues 'off the table' until after the asset

purchase was completed" (Pls.' Br. at 2), this argument is inconsistent with the undisputed evidence of the negotiations between Srivastava and Joyce concerning the severance benefits issues.  The parties do not dispute that Defendants expressed their intention to terminate negotiations for the asset purchase if Plaintiffs did not agree to take the severance benefits issues off the table.  Srivastava clearly agreed to take these issues off the table.  The record does not support Srivastava's strained argument concerning the limited applicability of his waiver.  Srivastava's purported understanding of the limited applicability of his waiver invites an interpretation of the waiver that would render the waiver virtually meaningless.  Clearly, Defendants' proposal for Plaintiffs to take the severance benefits issues "off the table" was not limited to discussions concerning the asset purchase.

With respect to stay bonuses, two additional arguments should be addressed.  Defendants argue that Srivastava was never offered or entitled to a stay bonus, and Michalski and Parikh are not entitled to stay bonuses because they refused to execute a release, which was one of the conditions precedent to receiving such bonuses.  First, Srivastava's claim for a stay bonus is unsupported by the record.  In the Severance Analysis, the blank space in the "Stay Bonus" column corresponding to Srivastava's name indicates that Srivastava was not offered a stay bonus.[4]  Second, the issue of whether signing the releases was a condition precedent need not be reached because regardless of the disposition of this release issue, Plaintiffs voluntarily waived their rights to receive stay bonuses.[5]

---

[4]In contrast, all other employees listed in the Severance Analysis had a dollar figure in the "Stay Bonus" column.

[5]All arguments concerning the condition of signing releases need not be reached because Plaintiffs voluntarily and effectively agreed to take the severance and stay bonus payments "off

Plaintiffs allege that in addition to breaching their oral contract, Defendants have breached their duties of good faith and fair dealing, owe Plaintiffs in *quantum meruit*, and were unjustly enriched.  For the following reasons, these arguments are unpersuasive.

First, Plaintiffs contend that Defendants breached their duties of good faith and fair dealing by unilaterally modifying their oral contract to pay severance and stay bonuses.  Plaintiffs do not offer much of an explanation supporting this allegation other than to argue in their Opposition Brief that Defendants' allegedly unilateral requirement of signed releases and inability to abide by the APA are "the very essence of bad motive or intent as defined by the cases Defendants cited in their brief."  (Pls.' Opp'n Br. at 11-12.)  Plaintiffs' argument fails because the record shows that Defendants did not unilaterally modify their oral contract to pay severance benefits to Plaintiffs but that the parties mutually agreed to take the severance benefits "off the table."

In every contract in New Jersey "there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing."  Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420 (N.J. 1997) (citations and quotation marks omitted).  Here, there is no evidence of bad faith on Defendants' part.  Defendants did not unilaterally modify the terms of any contract between the parties; in fact, Plaintiffs agreed to take their severance and stay bonus claims "off the table" as consideration for proceeding with the asset purchase.  Nor did Defendants fail to abide by the APA when it refused to pay severance and stay bonuses to Plaintiffs; the severance and stay

_____

the table."

bonus issues were not covered in the APA.  Plaintiffs have not shown that Defendants had bad motives or intention or acted unfairly, indecently, unreasonably, or dishonestly.  See Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (N.J. 2001).  Defendants made plain their intentions with respect to paying severance and stay bonuses, and Plaintiffs accepted Defendants' terms in order to proceed with the asset purchase.  Defendants did not destroy or injure Plaintiffs' right to receive the "fruits" of the oral contract because Plaintiffs, quite frankly, agreed to relinquish their claims to these "fruits".  The record simply does not show bad faith on Defendants' part.

Second, Plaintiffs argue that Defendants owe them in *quantum meruit*, which is a quasi-contractual theory that rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.  Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 172 N.J. 60, 68 (N.J. 2002).  To recover in *quantum meruit*, Plaintiffs must show: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation; and (4) the reasonable value of the services.  Id.  Here, Plaintiffs cannot show that they had a reasonable expectation of receiving their severance and stay bonuses, given the fact that they voluntarily waived such payments in order to proceed with the asset purchase.  Accordingly, Plaintiffs' *quantum meruit* claims will be dismissed.

Third, Plaintiffs argue that Defendants have been unjustly enriched by their refusal to pay severance and stay bonuses.  Plaintiffs argue that they performed all their obligations and expected remuneration pursuant to their oral contract and in the amounts stated in the Benefits Materials.  To establish unjust enrichment, Plaintiffs must show that: (1) Defendants received a benefit and (2) retention of that benefit without payment would be unjust.  VRG Corp. v. GKN

18

Realty Corp., 135 N.J. 539, 554 (N.J. 1994).  In this case, Plaintiffs have failed to show that

Defendants unjustly benefitted from not paying severance and stay bonuses.  Defendants

benefitted from Plaintiffs' waiver of such payments, but the benefit was not unjust because

Plaintiffs voluntarily agreed to waive these payments in exchange for Defendants' agreement to

proceed with the asset purchase transaction.

*(B) Performance bonuses*

> The following facts are undisputed:

- Srivastava and Michalski were promised performance bonuses for the first quarter of 2002 based upon a formula presented to and agreed upon by them, and
- Srivastava and Michalski received performance bonuses according to the agreed-upon formula and given their actual performance.

Defendants contend that these undisputed facts show that Srivastava and Michalski received the

benefit of the bargain.  Srivastava and Michalski do not dispute Defendants' contention but argue

that they should have received the maximum performance bonuses, even though their actual

performance did not meet all of the specified goals, because the performance goals specified in

the agreement were unattainable.  Plaintiffs also argue that their claims for performance bonuses

"are not ripe for summary judgment given the existence of factual issues regarding the terms and

conditions of their contracts."  (Pls.' Br. at 7.)  Plaintiffs' briefs do not reveal what the purported

factual issues are.

> Because Defendants have met their burden by showing that there is an absence of

evidence to support Plaintiffs' claims for maximum performance bonuses, Celotex Corp., 477

U.S. at 325, Plaintiffs have the burden of showing that there is more than some metaphysical

doubt as to the facts which are material to these claims.  Matsushita Elec. Indus. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).   In this case, Plaintiffs have failed to "set forth specific facts

showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  On the other hand,

Defendants have shown that they fully abided by their agreement to pay Srivastava and Michalski

performance bonuses according to a pre-announced and agreed-upon formula.  Plaintiffs have not

pointed to evidence of disputed material facts.

     To summarize, Plaintiffs' breach of contract and quasi-contractual claims will be

dismissed, and summary judgment will be granted to Defendants.

## III.  Fraud

     Defendants contend that they were fraudulently induced into entering the APA by

Srivastava's statement agreeing to take the severance and stay bonus issues "off the table."

Plaintiffs essentially make two arguments against a finding of fraudulent inducement: (a)

Srivastava merely agreed that with respect to the negotiation of the APA, Plaintiffs would "take

off the table" the issue of severance and bonus payments, which was not a representation that

Plaintiffs were waiving their claims to such payments or that Plaintiffs would never pursue such

claims in the future; and (b) the APA contains all the consideration by and between the parties,

and if Plaintiffs had agreed to enter into the APA on the condition that they waive their severance

and bonus payments, such a waiver must be expressly included in the APA but was not, thereby

showing that no such waiver was made.

     To prove fraud under New Jersey law, five elements must be met: (1) a material

misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of

its falsity; (3) an intention that the other party rely on the misrepresentation; (4) the reliance was

reasonable; and (5) damages resulted.  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (N.J.

1997).  In this case, the fifth element of fraud has not been met.  In their moving brief, Defendants argued that "[t]his litigation is the direct result of Plaintiffs' fraud and has damaged the Defendants by forcing them to expend a great deal of resources to defend themselves against claims that were fraudulently waived years ago."  (Defs.' Br. at 38.)  This argument does not show that Defendants have suffered damages, however, because "in New Jersey, each party must bear its own litigation expenses, including attorneys' fees."  Jugan v. Friedman, 275 N.J. Super. 556, 573 (N.J. Super. Ct. App. Div. 1994) (citations omitted).  Defendants' counsel also admitted at oral argument that Defendants could not show that they suffered damages if the court grants summary judgment in Defendants' favor on Plaintiffs' claims, which the court will do in an accompanying order.

Accordingly, because not all the elements of fraud have been met, summary judgment will be granted to Plaintiffs.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment as to its claims will be denied and will be granted with respect to Defendants' fraud counterclaim.  Correspondingly, Defendants' motion for summary judgment on Plaintiffs' claims will be granted and will be denied with respect to its fraud counterclaim.


/s/ Dickinson R. Debevoise
Dickinson R. Debevoise, U.S.S.D.J.


May 24, 2005

21